UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

ROBERT HAMLEN,

                  Plaintiff,

        -against-

GATEWAY ENERGY SERVICES CORPORATION,

                  Defendant.

----------------------------------------------------------------X

**OPINION AND ORDER**

16 Civ. 3526 (VB)(JCM)

Plaintiff Robert Hamlen ("Hamlen") commenced this putative class action against

Defendant Gateway Energy Services Corporation ("Gateway"), alleging that Gateway

overcharged thousands of New Jersey customers for natural gas. In his original complaint,

Hamlen asserted claims against Gateway for (1) violations of the New Jersey Consumer Fraud

Act ("NJCFA"), N.J. Stat. Ann. §§ 56:8-1 to -20; (2) breach of contract; (3) breach of the

implied covenant of good faith and fair dealing; and (4) unjust enrichment. (Docket No. 1).

Gateway moved to dismiss the complaint in its entirety pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure. (Docket No. 14). United States District Judge Vincent L. Briccetti

granted Gateway's motion in part, dismissing all of Hamlen's claims, except for his claim for

breach of the implied covenant of good faith and fair dealing. (Docket No. 28). Presently before

the Court is Hamlen's motion for leave to file an amended complaint.[1] (Docket No. 56). Hamlen

seeks to amend his complaint in two ways: first, by re-pleading his previously-dismissed claims

---

[1] On June 22, 2017, Judge Briccetti referred this action to me for the purpose of determining general pre-trial
matters, including non-dispositive pre-trial motions. (Docket No. 44). Motions to amend are considered non-
dispositive. *Thompson v. United States*, No. 16-CV-3468 (AJN), 2017 WL 2666115, at *2 (S.D.N.Y. June 19,
2017); *see also Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir. 2007) ("As a matter of case management, a district
judge may refer nondispositive motions, such as a motion to amend the complaint, to a magistrate judge for decision
without the parties' consent."). Accordingly, Hamlen's motion for leave to amend is properly before me pursuant to
28 U.S.C. § 636(b)(1)(A).

for breach of contract and violations of the NJCFA; and, second, by adding Direct Energy Services, LLC ("Direct Energy") as a defendant. For the reasons set forth below, Hamlen's motion is granted in part and denied in part.

## I. BACKGROUND

### A. The Original Complaint

On May 11, 2016, Hamlen filed his original complaint (the "Complaint" or "Compl.") on behalf of a putative class of New Jersey natural gas customers. (Docket No. 1). The following summary is based on the facts alleged in the Complaint.[2]

Hamlen is a New Jersey citizen who purchased natural gas from Gateway between November 2010 and January 2016. (Compl. ¶¶ 5, 19). Gateway is a New York corporation that sells natural gas to commercial and residential customers in New Jersey and other areas. (Compl. ¶¶ 6–7). Gateway has thousands of customers in New Jersey and "tens of millions of dollars in combined revenues." (Compl. ¶ 6). The natural gas offered by Gateway is a commodity that has the exact same qualities as natural gas supplied by other independent energy companies or local utilities. (Compl. ¶ 30).

In September 2010, Hamlen was a customer of New Jersey Natural Gas ("NJNG"), a different retailer, when he spoke with Gateway's representative via telephone. (Compl. ¶¶ 15, 19). The representative recited Gateway's standard sales pitch for its variable-rate natural gas plan, stating "your price of . . . natural gas will be a variable rate set by Gateway Energy based on market conditions and will fluctuate monthly." (Compl. ¶ 15). Subsequent to this

---

[2] This Opinion and Order assumes the truth of Hamlen's factual allegations and draws all reasonable inferences in Hamlen's favor for the limited purpose of deciding the motion presently before the Court. *See Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92, 93 (2d Cir. 2017).

conversation, Gateway provided Hamlen with a copy of its "New Jersey Residential Terms & Conditions" (the "Contract"), which is attached to the Complaint as Exhibit A. (Compl. ¶ 16).

Three clauses in the Contract are particularly relevant to this case. First, the "Variable-Rate Plan" clause provides:

> The price for all electricity or natural gas sold under our Variable-Rate Plan is a rate set by us each month based on our evaluation of a number of factors that affect the total price of electricity or natural gas to a customer. The following description is not exhaustive of all factors that may influence our pricing decision each month, but it does describe the major components that influence our analysis in a typical month. Each month our management uses the information described below, along with numerous other considerations, to determine how low a price we can charge in the upcoming month.
>
> - We determine the cost of all electricity or natural gas (including, where applicable, transmission costs, storage costs, transportation costs and line losses) that we have already obtained for delivery to customers in your utility territory for the upcoming month. Because we often acquire supply over time in preparation for future delivery needs (in an effort to mitigate the volatility in price) and do not acquire all of our required electricity or natural gas from the spot market, our supply costs may not directly follow spot market prices.
>
> - If additional supplies of electricity or natural gas will be required for the upcoming month, we will determine the anticipated cost to acquire such additional supplies from the spot market.
>
> - If we expect to have surplus supply for the upcoming month, we evaluate the expected income we may receive from selling the surplus. Additionally, with electricity, we may expect to have surplus or shortfall in any given hour of the upcoming month. In this case, we evaluate the expected income or costs that may be incurred by eliminating the surplus or shortfall.
>
> - We evaluate, if known, the prices that your utility and other competitors in your area plan to charge in the upcoming month.
>
> - We evaluate the amount of profit we hope to earn from the sale of electricity or natural gas in your utility territory.

- We evaluate any taxes that must be included in the rate we charge for electricity or natural gas in your jurisdiction.

- From time to time, and as a direct result of sudden or drastic increases in price, we may experience a higher level of cost to supply our customers than we wish to bill our customers in a single period. In these circumstances, we may amortize this expense to our customers over multiple billing cycles.

(Compl. Ex. A). For convenience, this Opinion and Order refers to the seven bullet-pointed items in the Variable-Rate Plan clause as the "Listed Factors."

Second, the "No Warranties" clause provides:

> We provide no warranties, express or implied, and we specifically disclaim any warranty of merchantability or fitness for a particular purpose. Additionally, unless expressly stated otherwise on your Enrollment Consent, we specifically disclaim any warranty or guaranty that the price charged by us for the energy supplied pursuant to the Agreement will be lower than the price that you would have been charged by the utility or another third-party supplier.

(*Id.*).

Third, the "Governing Law" clause provides that the Contract "is made and shall be construed in accordance with the laws of the State of New Jersey." (*Id.*).

Hoping to lower his natural gas bill, Hamlen switched from NJNG to Gateway in November 2010. (Compl. ¶¶ 19, 30). However, Gateway charged rates that were substantially higher than other independent energy retailers or local utilities. (Compl. ¶ 14). Gateway's rates were higher than NJNG's rates every month for a four-and-a-half-year period while Hamlen was Gateway's customer. (Compl. ¶ 20). Some months, Gateway's rates were more than double NJNG's rates. (*Id.*). Gateway often increased its rates during periods when wholesale and NJNG's rates decreased. (Compl. ¶¶ 23–24).

**B. Gateway's Prior Motion to Dismiss**

On July 6, 2016, Gateway filed a motion to dismiss. (Docket Nos. 9–10). The next day, Judge Briccetti issued an Order, *sua sponte*, granting Hamlen leave to file an amended complaint and stating that, "[i]f plaintiff elects not to file an amended complaint, the motion to dismiss will proceed in the regular course and, absent special circumstances, no further opportunities to amend will be granted." (Docket No. 12). On July 15, 2016, Hamlen declined the opportunity to file an amended complaint. (Docket No. 13).

On March 6, 2017, Judge Briccetti issued an Opinion and Order (the "MTD Decision") granting in part and denying in part Gateway's motion to dismiss. (Docket No. 28). Familiarity with the MTD Decision is assumed. In short, the court found that the Complaint provides only conclusory allegations that Gateway failed to base its rates on its cost for natural gas or market conditions. (*Id.* at 6). Regarding Hamlen's breach of contract claim, the court held that the Contract expressly grants Gateway discretion to set rates based on other factors and that allegations regarding those factors are not present in the Complaint. (*Id.* at 7). Regarding Hamlen's NJCFA claim, the court found that Hamlen agreed to allow Gateway discretion in setting the rate for natural gas without a promise of a rate lower than competitors' rates. (*Id.* at 5–6). The court concluded that Gateway's decision to exercise its discretion to set rates higher than other providers is not a sufficiently "substantial aggravating" circumstance to state a valid NJCFA claim. (*Id.* at 6).

**C. The Proposed Amended Complaint**

On May 24, 2017, after the MTD Decision was issued, Hamlen deposed Gateway's corporate representative, Mr. Cullen Hay, pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure. (*See* Docket Nos. 64-1 ¶ 6; 67-1 ¶ 2).[3]  On August 16, 2017, Hamlen moved for leave

to file an amended complaint, (Docket No. 56), attaching to his motion a copy of the proposed

amended complaint (the "Amended Complaint" or "Am. Compl.") as Exhibit 1, (Docket No. 56-

1).  The allegations in the Amended Complaint are largely similar to those in the Complaint, with

two principal additions.

First, the Amended Complaint supplements the allegations supporting Hamlen's breach

of contract and NJCFA claims against Gateway based on Mr. Hay's deposition testimony

regarding Direct Energy's consideration of "churn"—*i.e.*, customer attrition and retention—

when setting variable rates. (*See* Am. Compl. ¶¶ 37, 38, 51, 52, 54, 66, 67).[4]  During his

deposition, Mr. Hay testified that churn is "always a factor," "highly significant" and "the most

important consideration" when setting variable rates. (Am. Compl. ¶ 66).  The Amended

Complaint alleges that Direct Energy and Gateway "deceptively and consciously misrepresented

the most determinative factors they use to set variable rates by intentionally concealing 'churn'

as the most important factor, and they knowingly omitted that factor from their representations to

consumers because they knew no one would agree to a contract where customer attrition and

retention, rather than market factors, [are] the primary driver[s] of rate setting." (Am. Compl.

¶ 51).

Second, the Amended Complaint joins Direct Energy as a defendant and adds allegations

based on Mr. Hay's deposition testimony regarding the relationship between Gateway and Direct

Energy. (*See* Am. Compl. ¶¶ 7–8, 11, 17–23).  Direct Energy acquired Gateway as a wholly

---

[3] At the Court's direction, (Docket No. 70), Hamlen filed under seal a complete copy of the transcript of Mr. Hay's deposition (the "Hay Deposition" or "Hay Dep."), (Docket No. 71).

[4] The publicly-filed versions of the Amended Complaint, (Docket No. 56-1), and Hamlen's briefs, (Docket Nos. 57, 67), contain redactions because they reference information designated by Gateway as confidential.  The publicly-filed version of this Opinion and Order includes only information that the Court deems not to be a protected trade secret based on, among other things, the contents of Gateway's publicly-filed opposition brief, (Docket No. 64).

owned subsidiary in 2011. (Am. Compl. ¶ 8). The Amended Complaint alleges that "Direct Energy dominates Gateway (and has since its acquisition in 2011) in such a way as to make Gateway a mere instrumentality of Direct Energy." (Am. Compl. ¶ 17). The Amended Complaint further alleges that Direct Energy is liable for both Gateway's conduct, (Am. Compl. ¶¶ 59, 69, 75), and Direct Energy's own "unlawful conduct with respect to its own customers in precisely the same way as Gateway is liable to its customers," (Am. Compl. ¶ 23). Accordingly, the Amended Complaint expands the class definition to include customers of Direct Energy in addition to customers of Gateway. (Am. Compl. ¶ 42).

## II. DISCUSSION

### A. Hamlen's Request for a *Nunc Pro Tunc* Extension of Time to File His Motion

As a threshold issue, the Court must address Hamlen's untimely filing of the instant motion. On May 12, 2017, Judge Briccetti issued a Civil Case Discovery Plan and Scheduling Order, which, among other things, set an August 11, 2017 deadline for the parties to move for leave to amend pleadings or add parties. (Docket No. 36 ¶ 3). Hamlen filed a copy of the Amended Complaint on August 11, 2017, (Docket No. 54), but he did not file his motion seeking leave to amend, (Docket No. 56), until August 16, 2017—three business days late. Hamlen's counsel avers that he failed to meet the deadline due to a calendaring error: "[i]nstead of identifying the August 11, 2017 deadline in the firm calendar as the last day to file a motion to amend the complaint and add parties, counsel inadvertently calendared the event as simply the last day to file an amended complaint." (Docket No. 57 at 2). Hamlen therefore requests a *nunc pro tunc* three-day extension of the deadline. (*Id.*)

Ordinarily, requests for extensions are denied if made after expiration of the original deadline.[5] However, the Court finds that the modest extension requested by Hamlen will not unfairly prejudice Gateway, especially because Hamlen filed a copy of the Amended Complaint by the deadline to move for leave to amend, and Hamlen has shown good cause for the extension, namely that the brief delay was due to a good-faith calendaring error. Accordingly, the Court grants a *nunc pro tunc* extension of the deadline for Hamlen to move for leave to amend to August 16, 2017.

## B. Applicable Standard

Rule 15(a)(2) of the Federal Rules of Civil Procedure allows a party to amend a pleading with the court's leave, which the court "should freely give when justice so requires." Fed. R. Civ. P. 15(a)(2). "Under this liberal standard, a motion to amend should be denied only if the moving party has unduly delayed or acted in bad faith, the opposing party will be unfairly prejudiced if leave is granted, or the proposed amendment is futile." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 452 (S.D.N.Y. 2016). Proposed amendments are futile if they would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015). "Thus, the standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss." *Id.* "The party opposing the amendment has the burden of demonstrating that leave to amend would be futile." *Innis v. City of New York*, No. 17 Civ. 323 (LTS)(HBP), 2017 WL 4797904, at *1 (S.D.N.Y. Oct. 24, 2017).

---

[5] *See* Individual Practices of Judge Vincent L. Briccetti § 1(G) ("Absent extraordinary circumstances, requests for extensions will be denied if not made before the expiration of the original deadline."); Individual Practices of Magistrate Judge Judith C. McCarthy § 1(F) ("All requests for adjournments must be made 48 hours before the scheduled conference or expiring deadline, absent an emergency.").

"To survive a motion to dismiss in federal court, a complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Tannerite*, 864 F.3d at 247 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In considering a motion to dismiss, a court must "accept all factual allegations as true, drawing all reasonable inferences in the plaintiff's favor." *Physicians Healthsource*, 847 F.3d at 93.

Where, as here, the plaintiff also seeks to add an additional defendant, Rule 21 of the Federal Rules of Civil Procedure permits such joinder "at any time, on just terms." Fed. R. Civ. Proc. 21. "In practice, the standard for deciding whether to permit joinder under Rule 21 is 'the same standard of liberality afforded to motions to amend pleadings under Rule 15.'" *Agerbrink*, 155 F. Supp. 3d at 452 (quoting *Rush v. Artuz*, No. 00CIV3436(LMMDF), 2001 WL 1313465, at *5 (S.D.N.Y. Oct. 26, 2001)).

## C. The Re-Pleaded Breach of Contract Claim

Hamlen seeks to revive his breach of contract claim based upon facts obtained in discovery that, he contends, remedy the shortfalls discussed in the MTD Decision. (Docket No. 57 at 1). Invoking the law-of-the-case doctrine, Gateway argues that "the addition of allegations about 'churn' do not remedy the pleading deficiencies the Court previously found justified dismissal of the NJCFA and breach of contract claims." (Docket No. 64 at 23). The Court disagrees and finds that the Amended Complaint plausibly states a claim for breach of contract. The law-of-the-case doctrine does not control here because the Amended Complaint is based on new evidence and "alleges materially different and more detailed claims" than the Complaint. *Kregler v. City of New York*, 821 F. Supp. 2d 651, 658 (S.D.N.Y. 2011); *see also Gordon v. City*

9

*of New York*, No. 14 Civ. 6115 (JPO) (JCF), 2016 WL 4618969, at *4 (S.D.N.Y. Sept. 2, 2016)

(finding that the law-of-the-case doctrine did not control where "the proposed amended

complaint [was] not functionally identical to the original complaint").

Under New Jersey law, "a breach of contract claim requires proof of three elements:

(1) the existence of a valid contract; (2) a breach of that contract; and (3) resulting damage to the

plaintiff." *RNC Sys., Inc. v. Modern Tech. Grp.*, 861 F. Supp. 2d 436, 444–45 (D.N.J. 2012).

Hamlen entered into a contract with Gateway for the provision of natural gas. (Am. Compl. ¶ 62,

Ex. A). In relevant part, the Contract provides:

> The price for all electricity or natural gas sold under our Variable-
> Rate Plan is a rate set by us each month based on our evaluation of
> a number of factors that affect the total price of electricity or natural
> gas to a customer. The following description is not exhaustive of all
> factors that may influence our pricing decision each month, **but it
> does describe the major components that influence our analysis
> in a typical month**.

(Am. Compl. Ex. A (emphasis added)).[6]

The Amended Complaint plausibly alleges that Gateway breached the Contract. The

Contract grants Gateway the discretion to set its variable rate based on its own evaluation of a

number of factors. Additionally, the Contract is clear that the Listed Factors are non-exhaustive

and that Gateway may consider other factors. However, the Contract also limits Gateway's

discretion by specifying that the Listed Factors "describe the major components that influence

[Gateway's] analysis in a typical month." Gateway's decision to include the word "the" before

the phrase "major components" is significant. When drafting the Contract, Gateway could have

stated that the Listed Factors "describe *some* major components" or that they simply "describe

---

[6] The Contract also expressly incorporates the "telephonic . . . agreement to initiate service." (Am. Compl. Ex. A).
Drawing all reasonable inferences in Hamlen's favor, this language refers to the call in which Gateway's
representative told Hamlen that the variable rate would be "based on market conditions." (Am. Compl. ¶ 24).

major components"—or Gateway could have omitted the entire "major components" clause altogether. Gateway's use of the definite article "the" before the phrase "major components" could imply that the Listed Factors describe *all* of the major components or, at minimum, the most important components. *Cf. Kaufman v. Allstate New Jersey Ins. Co.*, 561 F.3d 144, 155 (3d Cir. 2009) (holding that "the definite article preceding the term 'claims' indicates that 'the claims asserted' means *all* the claims asserted"); *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 185 (3d Cir. 2006) (holding that "the use of the definite article 'the' before 'class claims, issues, or defenses' connotes comprehensiveness and specificity, rather than illustrative or partial treatment"). It is plausible that Gateway included the "major components" language in the Contract—thereby limiting its own pricing discretion—in order to induce customers to contract with it. (*See* Am. Compl. ¶ 41).

During his deposition, Mr. Hay testified that churn was "always a factor," "highly significant" and "the most important consideration" in setting the variable rate. (Am. Compl. ¶ 66). However, the Listed Factors, on their face, do not appear to encompass churn, at least not unambiguously. Consequently, viewing the factual allegations in the light most favorable to Hamlen, the Amended Complaint plausibly alleges that the Listed Factors did not "describe the major components that influence[d] [Gateway's] analysis in a typical month" and that Gateway therefore breached the Contract.

Gateway raises several arguments that, though they may ultimately prove meritorious, are not amenable to resolution now, when the Court must draw all reasonable inferences in Hamlen's favor. For example, Gateway suggests that its consideration of churn was beneficial, not harmful, to customers because "churn is often used as part of a competitive strategy to *hold down* variable rates." (Docket No. 64 at 21–22). One could interpret Mr. Hay's testimony to

mean that concerns about customer retention were always present in the background, operating when appropriate (for example, during a weather-related cost spike) like a ceiling or upper limit on the prices Gateway charged customers. (*See* Hay Dep. 37:16–18 ("[I]f we've been seeing exceedingly high churn in one market, we might choose to be more aggressive on pricing . . . in that market."); 134:8–25 (suggesting that Gateway considers churn when its own natural gas costs suddenly or drastically increase).[7] However, another plausible interpretation of Mr. Hay's testimony is that Gateway aimed to charge the highest rate that it could without causing excessive customer attrition—in other words, without too many customers realizing they were paying exorbitant rates and switching providers. The fact that churn was "always a factor" and "the most important consideration" could imply that Gateway aimed to set prices at or near the upper limit imposed by churn—even when consideration of the Listed Factors as the major components of Gateway's analysis would have yielded a lower rate. (*See* Hay Dep. 141:2–7 (acknowledging that "profit goals are mostly focused on [the] question of churn"); 208:7–11 (suggesting that Gateway can charge higher margins during months in which it expects less churn)).

Similarly, Gateway argues that "[c]ustomer churn permeates all decisions made by every business" and that "[n]o reasonable customer would believe that Gateway does not care whether its pricing causes customers to stay or go." (Docket No. 64 at 23). That may be true, but Hamlen premises his claim not only on the fact that Gateway considered churn—which is not

---

[7] A court's review of the viability of a proposed amended complaint is generally limited to the four corners of the complaint. *Innis*, 2017 WL 4797904, at *2. However, "[i]n determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." *New York Life Ins. Co. v. United States*, 724 F.3d 256, 258 n.1 (2d Cir. 2013). The Amended Complaint refers to, quotes from, and relies upon the Hay Deposition. (Am. Compl. ¶¶ 18, 20–21, 37, 66). Moreover, in opposing Hamlen's motion for leave to amend, Gateway argues that the Amended Complaint mischaracterizes Mr. Hay's testimony. (Docket No. 64 at 21–22). Therefore, the Court may properly consider the Hay Deposition in assessing the futility of Hamlen's proposed amendments.

surprising—but also the fact that Gateway used churn as "the most important consideration," which could suggest that Gateway's pricing strategy sought to "maximiz[e] price gouging without triggering excessive customer attrition." (Am. Compl. ¶ 54).

Hamlen's breach of contract claim is plausible even though the Contract expressly authorized Gateway to consider the amount of profit that it hoped to earn when setting the variable rate. (Am. Compl. Ex. A). Hamlen plausibly alleges that, although a reasonable consumer might expect Gateway to try to make a reasonable profit, no reasonable consumer would interpret the Contract as granting Gateway the discretion to optimize price gouging so long as it did not cause too much customer attrition. (Am. Compl. ¶¶ 36, 67). That interpretation is reinforced by Gateway's representation that it evaluates the Listed Factors, including its profit goals, "to determine how *low* a price [it] can charge in the upcoming month." (Am. Compl. Ex. A (emphasis added)). Despite that representation, Gateway varied the amount of margin it sought based on churn instead of, for example, seeking a fixed profit percentage as a margin above its costs. (*See* Hay Dep. 138:4–9; 139:9–12; 141:2–7).

Gateway also argues that it had disclosed its consideration of churn to Hamlen because some of the Listed Factors are related to or intertwined with the concept of churn. (Docket No. 64 at 23). For example, Gateway notes that the Contract explicitly allows Gateway to consider competitors' prices, which information "could be used only to ensure Gateway remains competitive" and thereby avoid losing customers. (*Id.*) The Court finds this argument unpersuasive. Although the two are undoubtedly connected, Mr. Hay's testimony suggests that Gateway considered churn as a factor distinct from competitors' prices.[8] It is possible that Gateway considered both churn and competitors' prices—affording the most significance to

---

[8] Notably, during his deposition, Mr. Hay categorized churn as one of the "other factors" that are *not* listed in the Contract. (Hay Dep. 136:20–25; *see also* Hay Dep. 154:5–12).

churn—because Gateway knew that competitive pricing and customer retention do not correlate perfectly (due to customers' imperfect knowledge, transaction costs associated with switching providers or any number of other reasons), and Gateway sought to exploit that imperfect correlation in a manner inconsistent with the terms of the Contract.[9] Accordingly, the Court finds that the Amended Complaint states a valid claim against Gateway for breach of contract.

**D. The Re-Pleaded NJCFA Claim**

Hamlen's re-pleaded NJCFA claim is not futile for reasons similar to those discussed in connection with his re-pleaded breach of contract claim. To state a claim under the NJCFA, a plaintiff must plausibly allege: "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009). The NJCFA prohibits "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . ." N.J. Stat. Ann. § 56:8-2. Courts "construe the CFA liberally because it is remedial legislation." *Hillsborough Rare Coins, LLC v. ADT LLC*, No. 16-916 (MLC), 2017 WL 1731695, at *10 (D.N.J. May 2, 2017). "If the parties' relationship is governed by a valid contract, a court may dismiss a claim under the [NJCFA] 'if the defendant's allegedly unlawful conduct is expressly authorized by the terms of the parties' agreement.'" *Windley v. Starion Energy, Inc.*, No. 14CV9053, 2016 WL 197503, at *2 (S.D.N.Y.

---

[9] Gateway highlights the Third Circuit's recent decision in *Orange v. Starion Energy PA, Inc.*, No. 16-1949, 2017 WL 4548069 (3d Cir. Oct. 12, 2017). (Docket No. 72). In *Orange*, the Third Circuit found that the plaintiff's allegation that the defendant's prices exceeded a local utility's rate was insufficient to establish a claim for breach of contract. 2017 WL 4548069, at *2. Here, however, Hamlen's breach of contract claim, as alleged in the Amended Complaint, is based not only on allegations regarding Gateway's comparatively high prices, but also the testimony of Gateway's representative that churn was the most important factor Gateway considered, arguably in violation of the terms of the Contract.

Jan. 8, 2016) (quoting *Urbino v. Ambit Energy Holdings, LLC*, No. 14-5184 (MAS)(DEA), 2015 WL 4510201, at *4 (D.N.J. July 24, 2015)).

In dismissing Hamlen's original NJCFA claim, the court found that the Contract authorizes Gateway to set its rate using its discretion based on its own evaluation of a number of factors. (Docket No. 28 at 5–6). The Contract also limits Gateway's discretion insofar as Gateway represented that the Listed Factors "describe the major components that influence [its] analysis in a typical month." Based on discovery conducted after the court issued the MTD Decision, the Amended Complaint plausibly alleges that churn was the most important factor Gateway considered, contrary to Gateway's representation that the Listed Factors describe "the major components" of its analysis. (Am. Compl. ¶ 37). Hamlen agreed to allow Gateway discretion in setting the rate for natural gas without a promise of a rate lower than competitors' rates; arguably, however, that agreement was premised on the understanding that Gateway's discretion would be tempered by Gateway's consideration of the Listed Factors as the major components of its analysis.[10] Hamlen plausibly alleges that the omission of churn from the Listed Factors, coupled with the representation that the rate would be "based on market conditions," rendered Gateway's statements deceptive because they had the capacity to mislead a reasonable consumer. *See Eberhart v. LG Elecs. USA, Inc.*, No. 15-1761, 2015 WL 9581752, at *4 (D.N.J. Dec. 30, 2015) (holding that, in an action under the NJCFA, "the test is whether an advertisement has the capacity to mislead the average consumer").

Simple breach of contract is insufficient to state a NJCFA claim; a plaintiff must allege "substantial aggravating circumstances." *Windley*, 2016 WL 197503, at *2 (quoting *Suber v. Chrysler Corp.*, 104 F.3d 578, 587 (3d Cir. 1997)). Substantial aggravating circumstances

---

[10] *Urbino* is distinguishable because Hamlen, unlike the plaintiff in *Urbino*, plausibly alleges that the defendant's conduct was inconsistent with the terms of the parties' agreement. *See* 2015 WL 4510201, at *3–4.

include the existence of bad faith or lack of fair dealing sufficient to constitute an unconscionable business practice. *Hillsborough*, 2017 WL 1731695, at *10. To meet this standard, a plaintiff must demonstrate that the business behavior in question stands outside the norm of reasonable business practice in that it will victimize the average consumer. *Id.* at *11. Here, Hamlen sufficiently alleges that Gateway acted in bad faith by exercising its discretion to charge unreasonable rates to profiteer off its customers, who reasonably expected to pay Gateway competitive prices for natural gas. (Docket No. 28 at 8). *See also Fritz v. North American Power & Gas, LLC*, No. 3:14cv643 (WWE) (D. Conn. Jan. 29, 2015), *available at* Decl. of Todd S. Garber in Opp'n to Def.'s Mot. to Dismiss, Ex. 2 (Docket No. 17-2), (denying motion to dismiss NJCFA claim because "a reasonable consumer could understand defendant's terms to offer rates that would vary based on the market and changes in the wholesale costs" and "the alleged affirmative representations or omissions may be construed as misleading and outside of reasonable business practices"). The Amended Complaint also plausibly alleges that Gateway intentionally misrepresented its pricing methodology to induce customers to sign up for Gateway's natural gas supply. (Am. Compl. ¶ 60). *Cf. In re AZEK Bldg. Prod., Inc., Mktg. & Sales Practices Litig.*, 82 F. Supp. 3d 608, 623 (D.N.J. 2015) (finding that "[p]laintiffs adequately allege[d] 'substantial aggravating circumstances' in the form of intentional misrepresentation to induce purchases of defective products"). Therefore, Hamlen has adequately alleged substantial aggravating circumstances and stated a valid claim for violations of the NJCFA.

## E. Joinder of Direct Energy

Hamlen argues that joinder of Direct Energy is warranted "both because [Direct Energy] is vicariously liable for any claims against Gateway . . . and because [Hamlen] has class standing to represent the claims of Direct Energy New Jersey natural gas customers as well as Gateway

customers." (Docket No. 57 at 1). The Court finds that the Amended Complaint does not allege sufficient facts to hold Direct Energy liable for Hamlen's claims against Gateway; consequently, Hamlen lacks standing to represent the claims of Direct Energy customers, and the proposed amendments joining Direct Energy are futile.

## 1. Applicable Law

As an initial matter, the Court must determine which state's substantive law governs Hamlen's alter ego theory. "Federal courts exercising diversity jurisdiction apply the choice-of-law rules of the forum state, here New York, to decide which state's substantive law governs." *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 175 (2d Cir. 2000). "New York's choice of law rules provide that 'the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.'" *Taizhou Zhongneng Imp. & Exp. Co., Ltd v. Koutsobinas*, 509 F. App'x 54, 57 n.2 (2d Cir. 2013) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)). Gateway is a New York corporation, (Am. Compl. ¶ 6), and therefore New York law decides whether its corporate form can be disregarded.[11]

Under New York law, "[t]he concept of piercing the corporate veil is a limitation on the accepted principles that a corporation exists independently of its owners, as a separate legal entity, that the owners are normally not liable for the debts of the corporation, and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners." *Morris v. New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 140 (1993).

---

[11] "The test for alter ego liability—where it is alleged that two defendants are essentially one in the same—is the same as for piercing the corporate veil." *Garmendia v. Bd. of Managers of 255 Cabrini Blvd. Condo. Ass'n*, No. 15-CV-1734 (CM), 2016 WL 751015, at *4 (S.D.N.Y. Feb. 24, 2016). "Under New York law, 'alter ego' and 'veil piercing' claims are synonymous." *Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, No. 11 Civ. 3238(ALC)(GWG), 2014 WL 988569, at *6 n.5 (S.D.N.Y. Mar. 13, 2014). The two phrases are used interchangeably here.

"Courts will pierce the corporate veil to prevent fraud or achieve equity by imposing a corporate obligation upon a parent." *New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 229 (2d Cir. 2014). "But to successfully pierce the veil, a plaintiff must show both domination of the corporation and that 'such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury.'" *Id.* (quoting *Morris*, 82 N.Y.2d at 141). "While complete domination of the corporation is the key to piercing the corporate veil . . . such domination, standing alone, is not enough . . . . The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene." *Morris*, 82 N.Y.2d at 141–42.

Veil-piercing claims are generally subject to the pleading requirements imposed by Federal Rule of Civil Procedure 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a); *EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 274 (S.D.N.Y. 2004). Nevertheless, "New York courts have made clear that the veil-piercing standard is demanding." *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388, 402 (S.D.N.Y. 2015). As such, "courts routinely dismiss alter ego claims pursuant to Fed.R.Civ.P. 12(b) (6)." *Key Items, Inc. v. Ultima Diamonds, Inc.*, No. 09 Civ. 3729(HBP), 2010 WL 3291582, at *10 (S.D.N.Y. Aug. 17, 2010).

## 2. Insufficiency of Hamlen's Alter Ego Allegations

The Amended Complaint alleges several facts that support Hamlen's alter ego theory, including that (1) Gateway does not maintain separate corporate books or records; (2) Gateway's finances are integrated with Direct Energy's finances; (3) Gateway does not maintain its own capital; (4) Gateway does not have its own directors, corporate officers or employees;

(5) Gateway's New Jersey residential natural gas website redirects to Direct Energy's website; (6) Direct Energy purchases natural gas on behalf of Gateway's customers together with Direct Energy's own customers; and (7) Direct Energy sets the variable rates for Gateway by integrating both companies' customers into one pricing model and considering them as a whole such that the companies' variable rates are identical within the same utility regions. (Am. Compl. ¶¶ 17–22).

Hamlen has adequately alleged that Direct Energy dominated and controlled Gateway—thus satisfying the first prong of the veil-piercing analysis. However, Hamlen's allegations are insufficient to satisfy the second prong. Hamlen has not adequately alleged that Direct Energy, through its domination of Gateway, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against Hamlen such that a court in equity should intervene. *See Bell v. Gateway Energy Servs. Corp.*, No. 17-cv-3893 (KBF), 2017 WL 5956887, at *2 (S.D.N.Y. Nov. 29, 2017) ("[T]he allegations that Direct Energy dominates Gateway or even sets consumer prices fall short of asserting that Direct Energy injured these plaintiffs in any way."). The second prong is essential to Hamlen's veil-piercing claim. *See Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997) (remanding because "the district court erred in the decision to pierce [the defendant's] corporate veil solely on the basis of a finding of domination and control").

Hamlen argues that the Amended Complaint "plausibly alleges that Direct Energy uses its domination of Gateway to commit deceptive and bad faith practices, namely charging rates not commensurate with its promise in the Terms & Conditions." (Docket No. 67 at 6). Courts typically find the second prong satisfied where the dominating party has used its control to, for example, place assets beyond the reach of creditors or otherwise avoid obligations. *See, e.g., Am.*

*Federated*, 126 F. Supp. 3d at 410 ("Siphoning assets to frustrate a creditor is precisely the type of deceptive and unjust abuse of corporate limited liability that warrants equitable relief."); *Atateks Foreign Trade, Ltd. v. Private Label Sourcing, LLC*, 402 F. App'x 623, 626 (2d Cir. 2010) (finding that fraudulent transfer of commission payments "was a wrong resulting in plaintiffs' injury because the commissions exacerbated defendants' insolvency and rendered them less able to pay damages"); *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 386 F. Supp. 2d 461, 476 (S.D.N.Y. 2005) ("Under New York law, the diversion of funds to make a corporation judgment-proof constitutes a wrong for the purposes of determining whether the corporate veil should be pierced.").

Some courts applying New York law have stated categorically that an ordinary breach of contract is insufficient to warrant piercing the corporate veil. *See, e.g.*, *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, No. 12 Civ. 2827(NRB), 2017 WL 3973848, at *12 (S.D.N.Y. Sept. 1, 2017) ("[I]t is well-established that an ordinary 'breach of contract, without evidence of fraud or corporate misconduct, is not sufficient to pierce the corporate veil.'" (quoting *Am. Federated*, 126 F. Supp. 3d at 403)); *Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC*, 40 N.Y.S.3d 46, 54 (1st Dep't 2016) (holding that "a simple breach of contract, without more, does not constitute a fraud or wrong warranting the piercing of the corporate veil." (quoting *Bonacasa Realty Co., LLC v. Salvatore*, 972 N.Y.S.2d 84, 86 (2d Dep't 2013)); *but see Cobalt Partners, L.P. v. GSC Capital Corp.*, 944 N.Y.S.2d 30, 34 (1st Dep't 2012) ("To use domination and control to cause another entity to breach a contractual obligation for personal gain is certainly misuse of the corporate form to commit a wrong."). In *Highland,* the court opined that "it is unclear whether a breach of an implied obligation of good faith even constitutes a wrong for purposes of veil piercing." 2017 WL 3973848, at *12. The court suggested that a

breach of the implied covenant of good faith is insufficient because New York courts treat such claims like claims for breach of contract. *Id.*

In *LaCourte v. JP Morgan Chase & Co.*, the court held that "[i]t is well established that the claimed fraud or injustice 'must consist of more than merely the tort or breach of contract that is the basis of the plaintiff's lawsuit.'" No. 12 Civ. 9453(JSR), 2013 WL 4830935, at *6 (S.D.N.Y. Sept. 4, 2013) (quoting *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 183 (2d Cir. 2008)). The court did not specify whether it was applying New York or Delaware law because it found that "New York and Delaware veil-piercing law do not materially differ." 2013 WL 4830935, at *6 n.2. *LaCourte* quotes *NetJets*, in which the Second Circuit applied Delaware law, citing *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989). Although not binding, the reasoning in *Mobil* has persuasive value:

> [R]egardless of which law is applied to the alter ego question . . . the outcome is the same. Fraud or something like it is required. . . . Any breach of contract and any tort—such as patent infringement—is, in some sense, an injustice. Obviously this type of "injustice" is not what is contemplated by the common law rule that piercing the corporate veil is appropriate only upon a showing of fraud or something like fraud. The underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping. The law requires that fraud or injustice be found in the defendants' use of the corporate form.

718 F. Supp. at 268–69. If underlying causes of action such as Hamlen's causes of action against Gateway were sufficient to establish the necessary "wrong" for piercing the corporate veil, then the second prong of the analysis would become meaningless once a plaintiff established that "the dominator of a corporation had complete control over the corporation so that the corporation 'had no separate mind, will, or existence of its own.'" *Freeman*, 119 F.3d at 1053 (quoting *Elec. Switching Indus., Inc. v. Faradyne Elecs. Corp.*, 833 F.2d 418, 424 (2d Cir. 1987)).

Assuming, *arguendo*, that the causes of action that Hamlen asserts can constitute a wrong sufficient to pierce the corporate veil, the Amended Complaint fails to allege a sufficient nexus between Hamlen's alleged injuries and Gateway's alleged misuse of the corporate form. Courts have articulated the second prong's nexus requirement in various ways. *See, e.g.*, *Singh v. NYCTL 2009-A Trust*, No. 14 Civ. 2558, 2016 WL 3962009, at *14 (S.D.N.Y. July 20, 2016) (dismissing veil-piercing claim due to "absence of any concrete allegation that [p]laintiff was harmed by a misuse of the corporate form"), *aff'd*, 683 F. App'x 76 (2d Cir. 2017); *EED Holdings*, 228 F.R.D. at 513 (dismissing veil-piercing claim because allegations failed to establish that the parent corporation's domination of its subsidiary "was the means by which wrong was done to" the plaintiff); *Key Items*, 2010 WL 3291582, at *9 (dismissing alter ego claim due to absence of allegations that defendants "used the corporate form to breach the contract or to frustrate contractual obligations"); *Aekyung Co. v. Intra & Co.*, No. 99 Civ. 11773(LMM), 2008 WL 4974424, at *3 (S.D.N.Y. Nov. 19, 2008) (holding that "dominance of a corporation plus fraud does not lead to piercing the corporate veil unless the corporate form was itself used to effectuate the fraud"); *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 64 (2d Cir. 2001) ("Without a finding that the domination occurred for the purpose of committing a wrong, the second element of a veil-piercing analysis has not been met."); *Rays Trading (H.K.) Co. v. Judy-Philippine, Inc.*, No. 98 Civ. 0170(JGK), 1998 WL 355422, at *4 (S.D.N.Y. July 2, 1998) (dismissing veil-piercing claim because plaintiff failed to allege "that the corporate form itself was used as the means to commit the wrongs allegedly performed"); *Alter v. Bogoricin*, No. 97 CIV. 0662(MBM), 1997 WL 691332, at *6 (S.D.N.Y. Nov. 6, 1997) (dismissing alter ego claims because "plaintiff has not established that the wrong

allegedly committed against him—the breach of contract—is related to any misuse of the corporate form").[12]

Assuming the truth of Hamlen's allegations, Direct Energy's domination of Gateway was related to Hamlen's injuries in the sense that Direct Energy employees made the pricing decisions that caused Gateway to breach its contractual obligations. However, Hamlen's injuries did not result from misuse of the corporate form itself, as in cases where a parent strips its subsidiary of assets in order to render the subsidiary judgment proof.[13] The alleged wrong committed against Hamlen—Gateway's overcharging for natural gas—did not necessarily depend on or directly relate to Gateway's limited liability status or its failure to observe corporate formalities. Gateway could have overcharged customers even if it had, for example, maintained separate corporate books and records.[14]

Moreover, Hamlen's factual allegations, assuming they are true, do not establish a need to disregard Gateway's corporate form in order to achieve equity or protect those who deal with

---

[12] Hamlen cites *Rochester Gas & Elec. Corp. v. GPU, Inc.*, 355 F. App'x 547 (2d Cir. 2009), as an example of a decision "to pierce the corporate veil even absent a link between the parent's domination of the subsidiary and the allegedly injurious [conduct]." (Docket No. 67 at 6 n.6). However, *Rochester* was a summary order, which does not have precedential effect. *See* 2d. Cir. Local R. 32.1.1(a). Moreover, the *Rochester* court expressly noted that the case involved "unusual facts," including that, unlike here, the plaintiff sought to pierce its own corporate veil to impose liability on its former parent for cleanup costs under an environmental statute. 355 F. App'x at 551.

[13] Notably, the Amended Complaint does not allege that Gateway was formed for illegal purposes. *See Credit Suisse First Boston v. Utrecht-Am. Fin. Co.*, 915 N.Y.S.2d 531, 534 (1st Dep't 2011) ("An inference of abuse does not arise . . . where a corporation was formed for legal purposes or is engaged in legitimate business." (alteration in original) (quoting *TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339–40 (1998))). Indeed, Direct Energy did not acquire Gateway until several months after Hamlen entered into the Contract with Gateway. (*See* Am. Compl. ¶¶ 8, 28).

[14] Hamlen cites *D. Klein & Son, Inc. v. Good Decision, Inc.*, 147 F. App'x 195 (2d Cir. 2005). (Docket No. 67 at 5). In that case, "the district court found that the common owners of [the defendants] used their domination of both companies to obfuscate their separate identities in dealing with [the plaintiff] both at the time the contractual relationship commenced and throughout their course of dealings." *Id.* at 198. The Second Circuit found that "[t]his misrepresentation as to the identity of the contracting party [was] the dishonest act or wrong satisfying the second requirement for veil piercing" because "a contract partner can be misled into thinking it is dealing with—and will have recourse against—a single, large entity." *Id.* at 198–99. Here, however, there is no analogous allegation that Direct Energy misled Hamlen into thinking he had recourse against it.

Gateway. Although the Amended Complaint alleges that "Gateway does not maintain any of its own capital," (Am. Compl. ¶ 18), it does not allege that Gateway is incapable of satisfying a judgment against it. In his reply brief, Hamlen argues that, "[s]hould [Hamlen] win a verdict, there is nothing preventing Gateway from ceasing operations, and should [Hamlen] seek to enforce a judgment, the sheriff would have no entity to serve nor property or assets to seize." (Docket No. 67 at 1). Yet, the Amended Complaint alleges that Gateway "has thousands of customers in New Jersey, and it has tens of millions of dollars in combined revenues." (Am. Compl. ¶ 6). That allegation renders implausible Hamlen's suggestion that Gateway would evade enforcement of a judgment against it in this action.[15]

Because Hamlen has not adequately alleged a direct claim against Direct Energy, he lacks standing to assert claims on behalf of Direct Energy natural gas customers. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012) (holding that, in the class action context, Article III standing requires that "for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant" (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007))); *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 65 (2d Cir. 2012) (rejecting argument that "a plaintiff's injury resulting from the conduct of one defendant should have any bearing on her Article III standing to sue other defendants, even if they engaged in similar conduct that injured other parties"). Hamlen's proposed amendments asserting claims on behalf of Direct Energy customers are therefore futile. *See Catalano v. BMW*

---

[15] If Gateway did attempt to evade a judgment in such a manner, then Hamlen could allege the second prong of the alter ego analysis and seek to impose liability on Direct Energy in an action for post-judgment relief. *See Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 39 F. Supp. 3d 516, 521–22 (S.D.N.Y. 2014) (holding that judgment creditor's veil piercing claim was properly brought as an action for post-judgment relief).

*of N. Am., LLC*, 167 F. Supp. 3d 540, 553 (S.D.N.Y. 2016) (dismissing claims against entity in putative class action on Article III standing grounds because the named plaintiff did not have a direct claim against that particular entity).[16]

## III. CONCLUSION

For the foregoing reasons, Hamlen's motion for leave to file an amended complaint is granted in part and denied in part. The motion is granted with respect to the proposed amendments that relate to the re-pleaded breach of contract and NJCFA claims against Gateway, as well as the deletion of the unjust enrichment claim. The motion is denied with respect to the joinder of Direct Energy. Hamlen is directed to file an amended complaint that is consistent with the rulings set forth above within ten calendar days of the date of this Opinion and Order. The Clerk is respectfully requested to terminate the pending motion (Docket No. 56).

Dated:    December 8, 2017
          White Plains, New York

**SO ORDERED:**

*Judith C. McCarthy*

_____
JUDITH C. McCARTHY
United States Magistrate Judge

---

[16] Because the Court finds that the proposed amendments joining Direct Energy are futile on other grounds, it need not reach the issue of whether the Court may exercise personal jurisdiction over Direct Energy.