20177chaml cf

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ---------------------------------------x
   ROBERT HAMLEN,
3
                Plaintiff,
4
5       v.                          16 Civ. 3526(VB)
6                                    CONFERENCE
7
   GATEWAY ENERGY SERVICES CORPORATION,
8
                Defendant.
9  ---------------------------------------x
10
                                    United States Courthouse
11                                  White Plains, N.Y.
                                    July 12, 2017
12
13
14 Before:  THE HONORABLE JUDITH C. McCARTHY, Magistrate Judge
15
16                       APPEARANCES
17
   FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP
18      Attorneys for Plaintiff
   DOUGLAS GREGORY BLANKINSHIP
19 CHANTAL KHALIL
20
   EDISON, McDOWELL & HETHERINGTON, LLP
21      Attorneys for Defendant
   MICHAEL D. MATTHEWS
22
23 FISHKINS, LUCKS, LLP
        Attorneys for Defendant
24 STEVEN MILES LUCKS
25 *Proceeding recorded via digital recording device.

```
 1                THE DEPUTY CLERK:  In the matter of Robert
 2    Hamlen v. Gateway Energy Services Corporation.
 3                Counsel, please state your appearances for the
 4    record.
 5                MR. BLANKINSHIP:  Good afternoon, your Honor.  My
 6    name is Greg Blankinship, and with me today is my associate,
 7    Chantal Khalil.  We're with Finkelstein, Blankinship,
 8    Frei-Pearson & Garber, and we represent Mr. Hamlen.
 9                THE COURT:  Nice to see you again, Mr. Blankinship.
10                MR. BLANKINSHIP:  Thank you, your Honor.  Nice to see
11    you as well.
12                THE COURT:  And welcome, Ms. Khalil.
13                MR. MATTHEWS:  Good afternoon, your Honor.  My name's
14    Matt Matthews.  I'm with the law firm of Edison, McDowell &
15    Hetherington, and with me today is Steven Lucks, my co-counsel
16    from the law firm of Fishkin & Lucks, and we represent the
17    defendant, Gateway Energy.
18                THE COURT:  Good afternoon, counsel.
19                Okay.  So this matter has been referred to me for
20    general pretrial by Judge Briccetti, but it also was referred
21    at a time when there were three issues.  He ruled on one and
22    there's two remaining discovery-dispute issues which the
23    parties have written letters to the Court requesting a
24    premotion conference.  This is that conference.
25                I've had a chance to review those letters.  I've had
```

1    a chance to look at the law.  I'm prepared to rule on it.  I

2    wanted to give each of you an opportunity to just say briefly

3    anything else you want me to consider before ruling on it.

4            So, since these are -- I think it's -- I'm not quite

5    sure where it starts.  Does it start with defendants?  And then

6    there's a cross with plaintiffs.  So, since I believe it

7    started with the defendants, I'm going to give the defendants

8    an opportunity to have brief arguments on this.

9            MR. MATTHEWS:  Yes, your Honor.  Thank you.  And I

10   appreciate that and certainly want to be respectful of the

11   Court's time.  If the Court has read everything and formed some

12   concrete thoughts on this, I certainly don't want to waste your

13   time.  If there are any specific issues that you would like me

14   to address, I would be happy to do that; if not, I'll just --

15           THE COURT:  Well, why don't you both -- you know, you

16   both have arguments about kind of which standard I should

17   apply, whether it's New Jersey law or whether it's the Federal

18   Rules of Civil Procedure, so if you want to speak briefly on

19   that.

20           MR. MATTHEWS:  Yes, your Honor.

21           So, under Federal Rule of Evidence 501, in a

22   diversity case, the common law -- in a diversity case, the law

23   of the underlying state controls issues of privilege as well.

24   That's Federal Rule of Evidence 501.  And that's relevant.

25           This is a diversity case in which New Jersey law

1    governs, and New Jersey has a specific statute and rule of

2    evidence regarding trade-secret privilege.  And the statute is

3    Section 2A:84A-26, which is also memorialized in New Jersey

4    Rule of Evidence 514.  And what that rule says is the honor of

5    a trade-secret privilege, which may be claimed by him or his

6    agent or employee, has a privilege to refuse to disclose the

7    secret and prevent other persons from disclosing it if the

8    judge finds that the allowance of the privilege will not tend

9    to conceal fraud or otherwise wart an injustice.

10           So I'm not sure if it's contested that New Jersey law

11   applies to this trade-secret issue, but to the extent it does,

12   I think Rule 501 of the Federal Rules of Evidence and Rule 514

13   of the New Jersey Rules of Evidence establish that New Jersey

14   law would apply and would protect trade secrets.

15           So the way that New Jersey courts apply this

16   trade-secret privilege is to look at whether the plaintiff --

17   or the requesting party, I should say, has demonstrated a need

18   for these trade secrets that outweighs the harm that would

19   result from their disclosure, and it's our contention that they

20   have not.  We're not -- and I think -- I hope it's clear from

21   our papers we're not refusing to produce any trade secrets.

22   The trade secrets that we are attempting to limit production of

23   are those that are not relevant to the claims at issue in this

24   case.

25           THE COURT:  Well, I guess the question that

1    plaintiffs have or their allegations are that we're dealing

2    with variable rate and fixed rate, and plaintiffs are arguing

3    you can't look at one in a vacuum; that, you know, the way

4    you -- their theory is the way you apply and determine what

5    your variable rate will be depends on the fixed rate and so

6    that, by -- and correct me if I'm misstating it because it's

7    already been a very long day -- so, because of that, you know,

8    you really can't understand the full picture if you don't

9    understand all of it.

10         MR. MATTHEWS:  Well, what I would say with respect to

11   that, I would reference a couple of statements that our

12   corporate representative made.  He testified that the company

13   does consider the fixed rate itself, the rate itself, when

14   setting variable rates.  He also testified that the company

15   does not consider the profitability of the fixed rates in

16   setting the variable rates.

17         Now, to try to explain why that's important, what

18   we're willing to disclose here and what we have disclosed, I

19   would make a distinction between essentially the sausage and

20   the sausage making, so to speak.

21         We've allowed plaintiffs discovery on what the fixed

22   rates themselves were; the number of customers that Gateway had

23   that were on fixed rates, marketing materials related to fixed

24   rates, the customers who were charged a variable rate who had

25   also at some time been charged a fixed rate.  So the issue of

1    the fixed rates, which is what the company says it does

2    consider when citing prices, we're not trying to keep that

3    under wraps.

4              What we are saying are the trade secrets that we are

5    entitled to redact or instruct witnesses not to answer based on

6    the trade-secret privilege is the sausage making, the

7    profitability of the fixed rates, which the company doesn't

8    consider, the cost of the fixed products and the pricing

9    methodology behind the fixed rates themselves.  Those are the

10   trade secrets that we're trying to protect.

11             The other things, the existence of what the fixed

12   rates were, how the rate itself compared to the variable rates,

13   that's not what's at issue here, and that's all that our

14   witness has said the company considers when setting the

15   variable rates.

16             THE COURT:  How is your pricing mechanism -- is your

17   pricing mechanism -- rather than answering how, because it's

18   going to trade secret, is your pricing mechanism different for

19   the fixed rate and the variable rate?

20             MR. MATTHEWS:  The strategies are somewhat different.

21             THE COURT:  And so issues of hedging and the

22   contracting is different depending on --

23             MR. MATTHEWS:  Exactly, because the fixed rate -- the

24   company, at this point in time and since 2011, has not sold any

25   variable-rate contracts.  They only sell fixed-rate products,

1    since 2011.  So those fixed-rate contracts are typically a

2    year, 18 months.  I think, in some instances, they can be six

3    months.  In some instances, they're two years.  And so, for

4    that reason --

5         THE COURT:  But are we asking for historical

6    information in this or are we asking for current information in

7    the request that plaintiffs have made?

8         MR. MATTHEWS:  As I understand it, both.  I think

9    most of the plaintiff's requests relate back at least to 2010

10   with certain other information.

11        I don't think, with respect to the pricing

12   strategies, and correct me if I'm wrong, that you're seeking

13   information prior to 2010.

14        There are certain contract forms and marketing

15   materials that the plaintiff has requested and that have been

16   produced that predate that time period, but I think, with

17   respect to pricing, it would be 2010 to the present.

18        THE COURT:  Okay.  Okay.

19        So why do you need this information?

20        MR. BLANKINSHIP:  Your Honor, I think you concisely

21   stated it at the beginning.  One of the reasons why we think

22   the fixed-rate information, and particularly the fixed-rate

23   profit margin, is relevant is that it is a sausage-making

24   process, and it's impossible to pick out the -- well, I won't

25   get too graphic, but you can imagine -- it's impossible to

1    break that up.

2          There are other reasons, though, why discovery about

3    the fixed-rate profit margins are relevant.  First is that we

4    believe that discovery will prove that the defendant makes a

5    marginal profit on its fixed-rate customers because, as

6    Mr. Matthews just explained, that's the only way in which it

7    gets current customers.  That's a source of its customer base.

8    And, of course, it has to offer low fixed rates that are below

9    utility because no customer would ever switch from utility to

10   these independent energy companies if it was going to cost them

11   more money.  And the reason why the defendant can make these

12   low, if at all marginal profits on fixed-rate customers is it

13   knows that it's going to profiteer the expense of the

14   variable-rate customers once they transition from a fixed rate

15   to a variable rate.  So our argument is that --

16          THE COURT:  And you can still transition even

17   though -- you know, they talked about having -- since 2011,

18   there's only been fixed-rate contracts.  You can transition to

19   a variable rate?

20          MR. BLANKINSHIP:  Absolutely, your Honor.  There are

21   two sources of current variable-rate customers, those who were

22   signed up with a variable rate or a one or two-month teaser

23   rate or now with fixed rates.  The way the contract functions

24   is that once your fixed rate term is over -- they're always for

25   a term of six months or twelve months -- then you're

1   automatically transitioned to the variable rate with a rate

2   that should be as is described in the terms and conditions

3   every customer gets.

4           THE COURT:  Is there a ceiling on what can be

5   increased during the variable rate from what the fixed rate is

6   or just is a -- I mean from a fixed rate to a variable rate?

7   Is there a ceiling on what can happen to the variable rate?

8           MR. BLANKINSHIP:  There is not, your Honor.  There is

9   a small portion of the customer base that received a separate

10  product that's not at issue in this litigation.  It's a price

11  protection plan.  That was only in place for a short amount of

12  time, and that's not part of the class.  And, unfortunately,

13  that's exactly what we see is that Gateway, rather than setting

14  prices and making a commercially reasonable profit in line with

15  its duty of good faith and fair dealing, simply increases the

16  variable rate until customers start quitting.  That's what it

17  calls churn.  So our argument -- one of our arguments as to why

18  fixed-rate profits are relevant is it demonstrates bad faith.

19          Now, we discussed a little bit about the extent to

20  which the pricing strategy differs from fixed and variable

21  rates, but there's a substantial overlap.  For example -- and

22  Mr. Hay testified to this, the (30)(b)(6) witness.  Sometimes

23  when North America Power goes out to buy natural gas for its

24  fixed rate and variable-rate customers, it does so at the same

25  time without differentiating how those buckets are going to be

1    broken up.  And I think discovery will show, as it's shown in

2    the half a dozen other cases we've done against independent

3    energy comes, that the costs for the fixed rates really aren't

4    that different than the costs that Gateway incurs to provide

5    natural gas for its variable-rate customers.  And so what you

6    have is more or less the same level of costs at a significantly

7    higher profit margin.  That is a demonstration of bad faith.

8            THE COURT:  Well, wouldn't you be able to hedge more

9    for your fixed rates and so you can contract farther out for

10   your fixed rates because you know what you're trying -- you

11   know, you're trying to lock in a certain price because you're

12   charging a certain price on that and the variable rate you have

13   no flexibility to do the short-term hedging or short-term

14   purchase and sales of it, you know, so it would be done

15   differently?

16           MR. BLANKINSHIP:  It can be done differently, but, as

17   Mr. Hay testified, it's not always done differently.  And the

18   reverse is also true, your Honor.  If you purchase -- if you

19   have a hedging transaction where you're purchasing gas a year

20   or two out, then you have a partner in that hedging transaction

21   which is guessing where that wholesale rate is going to be in a

22   couple years.  And then they do this with a number of different

23   contracts.  So it stands to reason that, in a competitive

24   market, sometimes markets will change in between this contract,

25   and so sometimes they will be lower and sometimes they will be

1    higher.  In the short term, there may be differences, but, in

2    the long term, those costs should more or less even out.  It's

3    the nature of a competitive market.  Unless, of course, Gateway

4    is so much smarter than everybody else in the market that they

5    can predict stuff and hedge in advance, which may be true.

6    That's something that we would find in discovery.

7              There's a second reason why the variable-rate profit

8    margins are relevant, and that is it goes to commercial

9    reasonability.  One of the things that Judge Briccetti

10   identified in his order that plaintiff could use to prove bad

11   faith is comparing other profits to determine whether the

12   profit defendant reaps for its variable-rate customers is

13   commercially reasonable.  I would suggest that a short and easy

14   way to do that, in addition to other mechanisms that we'll

15   pursue, is you look at what other products Gateway itself

16   offers and what kind of profit margin Gateway itself offers

17   those customers.  And I think what we'll find is that -- and

18   again --

19             THE COURT:  Those products have to be similar.

20             MR. BLANKINSHIP:  Well, I would suggest they, because

21   the costs are similar -- and again, this is something we think

22   we'll discover.  We're only talking about one product here.

23   It's just natural gas.  Now, maybe you have fixed rate versus a

24   variable rate, but you're just getting one bill.  And this is

25   what customers expect.

1              When a reasonable consumer is trying to determine

2      whether or not they're going to go with Gateway and whether or

3      not they're going to switch to another fixed rate as opposed to

4      moving to the variable rate, they're not just going to consider

5      other variable rates in the market.  They're going to consider

6      the utility rate.  They're going to consider the rates of other

7      ESCOs coast.  And Gateway itself concedes this.  Their contract

8      says that they will consider the rates other utilities

9      consider.  Well, in New Jersey, natural gas isn't -- natural

10     utilities don't charge a variable rate for natural gas.  They

11     charge a rate that's set years in advance.  So Gateway knows

12     that, at the very least, it's going to compare its variable

13     rate to the utilities' fixed rate.  And I think it stands to

14     reason that a reasonable consumer --

15              THE COURT:  Why are the utilities doing it so far in

16     advance for natural gas?

17              MR. BLANKINSHIP:  It's a regulatory decision that has

18     been for decades.  What they do is they purchase gas on a

19     three-year rolling cycle.  So they buy a third for each of the

20     three years.

21              THE COURT:  Is that the same as in New York for gas?

22              MR. BLANKINSHIP:  It's not.  I don't believe it is.

23     I know that, in New York, electricity is a pure market price

24     because electricity utilities buy it on a spot market.  I think

25     it's more or less the same for gas.

1          THE COURT:  I worked in electric utility before I

2    took the bench, so that's why I know it is a spot market, it is

3    a hedging, and fixed and variable rates are different, but I

4    never -- I'm not familiar with the gas industry in either New

5    York or New Jersey.

6          MR. BLANKINSHIP:  Don't hold me to it.  I am

7    reasonably certain that New York natural gas is more reflective

8    of a short-term market price.

9          THE COURT:  Okay.

10          MR. BLANKINSHIP:  But, again, the utility price

11    should, over the long run, even in New Jersey, reflect the

12    market price because they're buying gas in the same hedging

13    strategy that defendant is allegedly using, at least to some

14    degree.  And the fact that utility prices are always

15    significantly lower than Gateway's price is another indicator

16    that they're contrary to the representations they're not

17    providing a market price.

18          If I could just make a couple more points, your

19    Honor.

20          THE COURT:  Yes.

21          MR. BLANKINSHIP:  We've been talking about the

22    substance of the dispute, namely, whether fixed rates are

23    appropriate, but there are serious procedural issues -- or

24    procedural infirmities with the defendant's motion for a

25    protective order.  Namely, it's improper to instruct a witness

1    not to answer the question in the middle of a deposition when

2    you haven't moved for a protective order.  And they had our

3    deposition notice for I think two months before the deposition.

4    It's improper to instruct a witness not to answer without

5    having first moved for a protective order in the court,

6    particularly given that Judge Briccetti has a protective order

7    in place.  And, candidly, I think the defendant violated Judge

8    Briccetti's protective order because it provided that if

9    there's confidential information in a deposition, it provides a

10   specific mechanism to protect that information.  It does not

11   provide for an exception to the Rule 34(c)(2), which provides

12   that there shouldn't be objections absent a privilege.  So

13   there's that --

14            THE COURT:  Well, see, but they would argue that

15   there is a privilege because, under New Jersey law, trade

16   secret is privileged, and so they would be saying that we are

17   allowed to direct a witness not to answer privileged questions,

18   whether it be attorney/client privilege or trade-secret

19   privilege, based on New Jersey law.

20            Whether that interpretation is right, honestly, I am

21   not going to get into that here.  I think I can see it being a

22   good-faith argument, as they put in their letters, and I

23   understand it, so I don't want to address that today.  I can

24   see that -- I see your argument.  I see their argument.  And

25   since it really doesn't matter, it really is whether what's

1    going to go on in the future and what I'm going to rule on the

2    substantive side, I'm not going to address that procedural

3    violation.

4            MR. BLANKINSHIP:  Okay.  I understand, your Honor.

5            I would just like to briefly address the procedural

6    issues with our motion; namely, that the defendant not be

7    allowed to redact what it considers irrelevant or trade secrets

8    in documents that are indisputably otherwise relevant.

9            And the documents we're talking about so far are

10   spreadsheets.  The defendant uses these pricing spreadsheets in

11   order to set its rates, and to demonstrate how

12   interconnected --

13           THE COURT:  Hold on one second.

14           (Pause)

15           THE COURT:  Go on.

16           MR. BLANKINSHIP:  So to demonstrate the

17   inter-connectivity between the fixed rate and the variable

18   rate, that process, they only have one spreadsheet that covers

19   both fixed rate and variable-rate setting, and it's the same

20   personnel who set these rates, and they do it all in the same

21   process during the course of a month.  So when defendant

22   produced these spreadsheets, they were massively redacted.  All

23   that was left was narrow information relating to New Jersey

24   natural gas variable-rate customers.  So we believe it's all

25   but black letter law that it's improper to redact otherwise

1    arguably irrelevant or trade-secret information.

2              And I would note, your Honor, the information they

3    redacted isn't just trade secrets.  For example, they redacted

4    everything related to fixed rates, including what the actual

5    fixed-rate customers -- the fixed rates were that tens of

6    thousands of customers were actually receiving.  And this gets

7    to the issue with how difficult it is for us to try to parse

8    what they redacted to figure out whether the redactions they've

9    done are appropriate or inappropriate.

10             And I think it's telling, your Honor.  And we're

11   talking hundreds, if not thousands of spreadsheets.  And this

12   is issue is going to come up again when we get into e-mail

13   because I think we're going to find that the fixed rate and the

14   variable-rate setting process and the process by which they buy

15   natural gas are interconnected.  So these e-mails are going to

16   cover both of these topics.  And that's what we've seen in all

17   the other cases that we've done.

18             So they're going to be redacting who knows how many

19   hundreds, you know, thousands and thousands of e-mails plus all

20   these spreadsheets.  It's a huge expense for the defendant.

21   The only reason they would go to that trouble is because they

22   know that it's damning evidence that they're trying to keep

23   out, keep plaintiff from obtaining.

24             It also causes significant burden on us as we have to

25   try to parse through this information, figure out what the

1    documents say without having any of the relevant context.   And

2    I guarantee it's going to cause burden on the Court because

3    we're going to get into fights about what was appropriately

4    redacted, what wasn't.   Your Honor's going to have to look at

5    in-camera spreadsheets and try to figure out what's appropriate

6    and what's inappropriate.   None of that's necessary.   And,

7    candidly, I don't think it's authorized under the federal

8    rules.

9         And I guess that gets, your Honor, to the other

10   question about which law governs the procedure for protecting

11   trade secrets.   We don't dispute that the question of whether

12   the particular information at issue, whether that's a trade

13   secret.   That is governed by substantive New Jersey law.   But

14   this is an Erie Court.   The question of the procedure by which

15   those substantive protections are afforded is a question of

16   federal law, and you see that in all the cases that we cited.

17        In contrast, the two cases the defendant cited for

18   the proposition that redactions are appropriate were two.

19   Capital Health Systems.   That's a New Jersey State Court

20   decision, not applying federal law.   And I would note, your

21   Honor, that that case is about a substantial written report

22   that appears to have been put together with discrete sections.

23   They could be easily redacted without destroying the meaning of

24   the document.   Not at all what we're dealing with here.   And

25   the second case they cite is Millennial Health.   That is a

1    Southern District of New York Court, but that case is about

2    text messages, not hundreds of spreadsheets and other

3    materials.  And with all due respect to the Millennial Health

4    court, there's no analysis at all about propriety of

5    redactions, and I suspect that's because the parties didn't

6    bring that issue to the court.  The entire decision is all

7    about whether the particular information at issue was relevant

8    or not.  There was no -- it doesn't appear that there was any

9    briefing or substantive discussion about the propriety of

10   redacting otherwise relevant information.  And we believe that

11   our cases are much more persuasively reasoned.

12          So I know I've gone on for quite a while.  If there's

13   anything else your Honor would like me to address, I would be

14   more than happy to.

15          THE COURT:  No, that's it.  Thank you.

16          Mr. Lucks, anything you want to respond to that?

17          MR. MATTHEWS:  Yes, your Honor.  Matt Matthews.  And

18   I'll try to be brief.

19          Going back to where plaintiffs started, with their

20   argument that the profit of the fixed rates is relevant, that's

21   just not supported by the complaint.  And the easiest way that

22   I think I can explain that is that the complaint, the claim

23   that they brought, that survived dismissal, is good faith and

24   fair dealing claim that looks outward.  It looks at what

25   customers would expect Gateway's rate, variable rate, to do by

1     comparison to the utility and other competitors' rates.  What

2     they're now seeking is information that looks inward.  What

3     does Gateway do with its other products?  This has nothing to

4     do with the utilities' or other competitors' rates.  And

5     Gateway has no information about the utility or other

6     competitors --

7                THE COURT:  Doesn't it go to -- are you saying, you

8     know, why you do what you do is completely irrelevant?  It's

9     just whether yours compared to everybody else's indicates any

10    issues of, you know, inflated cost?  I mean, I would think how

11    you fix the rate, why you fix the variable rate as it is is

12    relevant.  And that's what they're saying this is all going to

13    figure out.  That is an inward look.

14                MR. MATTHEWS:  Well, but not at the fixed-rate

15    product, which, your Honor, is identified as --

16                THE COURT:  Well, it wouldn't be if your client

17    hadn't said that they do look at fixed rate to determine

18    variable rate.  If your client says they're apples and oranges,

19    we don't look at anything, we don't care what our fixed rate

20    is, our variable rate is based on X, Y, Z and, you know, at the

21    end, we may look and say, hey, they're the same or we may look

22    and say, oh, they're dramatically different, but it wouldn't

23    change anything, but the fact that they do look at it and take

24    it into consideration, then it becomes an issue.

25                MR. MATTHEWS:  It does with respect to the rate, the

1    fixed rate itself, and we're not trying to hold that back, but

2    with respect to the profits --

3         THE COURT:  Yes, but you're trying to hold back

4    information that would allow them to understand the fixed rate

5    and, therefore, be able to understand how that compares to

6    variable rate.

7         MR. MATTHEWS:  Again, the case is not about whether

8    our variable rate was fair in comparison to the fixed rate.

9    That's not the allegation in the complaint.  The allegation in

10   the complaint --

11        THE COURT:  No, but if they can say that your

12   variable rate is particularly bad because of what you do with

13   the fixed rate and that you, in fact, changed your variable

14   rate because your fixed rate is so competitive, because of what

15   you do in that, your variable rate ends up being so much

16   higher, not necessarily than the fixed rate, but than anybody

17   else's, because you're making profit on a different subset of

18   your customers, isn't that relevant?

19        MR. MATTHEWS:  I don't think that the profit that the

20   company makes on variable rates is what this case is about, and

21   it would -- if it is, it --

22        THE COURT:  Why?  I'm not sure they're saying it's

23   just the profit.  It's what's going into all of it.

24        MR. MATTHEWS:  Well, what's going into all of it in

25   terms of how the company compares its variable rate to its

1  fixed rate we've produced, and we will allow them discovery on

2  that.  As to the profitability of the fixed rate, the hedging

3  strategies, that --

4           THE COURT:  Yes, but what if your fixed rate is not

5  profitable?  What if your fixed rate, you know it's never going

6  to be profitable and you say that's okay because we can

7  supplement the lack of profitability based on the variable

8  rate?

9           MR. MATTHEWS:  Sure.

10          THE COURT:  That's not relevant to what plaintiff's

11  claims are?

12          MR. MATTHEWS:  No.  I don't think it is, and here's

13  why.  I think that what this case is about is the rates and how

14  the rates compare to the market.  And so what that argument

15  would do is turn the Court into profit police.  So if Gateway's

16  really good at keeping its costs low and making a big margin,

17  but it's rates are still lower than the competitors and still

18  compared reasonably with the utilities, I would submit that

19  there's nothing wrong with that.

20          THE COURT:  Doesn't it go to good faith and fair

21  dealing?

22          MR. MATTHEWS:  No.

23          THE COURT:  How does it not go to good faith?

24          MR. MATTHEWS:  If our rate is still a competitive

25  rate, then we shouldn't be penalized for running the company in

1        an efficient way.  That's what I would say.  If we're able to

2        make a good profit -- we shouldn't be penalized for running a

3        company efficiently and making a good profit if we're still

4        offering consumers a rate --

5                THE COURT:  But this is implied covenant of good

6        faith and fair dealing with your customers.

7                MR. MATTHEWS:  Correct.

8                THE COURT:  Your variable-rate customers.

9                MR. MATTHEWS:  Yes.

10               THE COURT:  Doesn't whether they have acted in good

11       faith and fair dealing with the customers -- let's say you run

12       your company so well that you could actually give your

13       variable-rate customers a discount on what the market gives,

14       but you don't because you want to make more money.  You're

15       saying it doesn't really matter what you do as long as what

16       you're getting is comparable to the outside industry.

17               MR. MATTHEWS:  That is the way that they have framed

18       the issue in the complaint is that consumers expect that their

19       rate from Gateway will be competitive with other ESCOs and with

20       the utility, so, yes, I would submit that --

21               THE COURT:  And they're saying your rate's not.

22               MR. MATTHEWS:  Correct.

23               THE COURT:  Okay.

24               MR. MATTHEWS:  But the issue that we're talking about

25       today is not about is the rate competitive with other ESCOs, is

1    the rate competitive with the utility.  They're asking is the

2    profit on that product more or less the same as it is on a

3    product that's not at issue at all in this case, the fixed-rate

4    product.  And again, our corporate representative has testified

5    that the company does not consider the profitability of the

6    fixed rates when setting the variable rates, only the fixed

7    rates themselves, which we will give in discovery.

8            THE COURT:  I'm going to ask Mr. Blankinship to

9    respond to this before we go on.

10           MR. MATTHEWS:  Sure.  Thank you, your Honor.

11           THE COURT:  So you should only be looking outward.

12           MR. BLANKINSHIP:  Yes, your Honor.

13           As Judge Briccetti clearly noted in his order, we

14   have to prove bad faith.  There's little that looks more inward

15   than a determination of whether a defendant is acting in bad

16   faith when they're setting -- when they're using their

17   discretion to set rates.  That's literally something that we

18   couldn't -- our complaint, to the extent it focuses outward, is

19   because that information was available to the plaintiff before

20   we filed the complaint; namely, our ability to compare the

21   rates that they're charging versus the rates other people are

22   charging and also versus the wholesale costs.

23           And it's also inaccurate, your Honor, to say that all

24   we've pled is that it's a question of how their rates compare

25   to utility rates and other ESCOs rates.  We also specifically

1    plead that one of the reasons why they're not acting in good

2    faith and they violate the duty of good faith and fair dealing

3    is that their rates aren't commensurate with their internal

4    costs.  And so that's one of the -- and again, if it turns out

5    that the costs for the fixed rate are in line with the costs of

6    the variable rate, that goes a long way to demonstrating that

7    they don't set the variable rate in good faith and that they

8    don't set a commercially reasonable profit.  And without having

9    discovery about how these two interrelated products work, we

10    would be hamstrung.

11              THE COURT:  Okay.

12              Mr. Lucks, you want to say anything else?  Otherwise,

13    I'm prepared to rule.

14              MR. MATTHEWS:  I'll be very brief on a couple of

15    separate issues that Mr. Blankinship raised.

16              On the issue of redactions, the cases that we've

17    submitted to the Court, which Mr. Blankinship referenced, the

18    Capital Health case and the Millennial Health case show

19    instances where the courts have done just this, allowed parties

20    to redact irrelevant trade secrets from documents that are

21    otherwise relevant.  The cases that the plaintiff cites in that

22    respect just go to the issue of relevance.  They don't deal

23    with trade secrets themselves, which is what's at issue here

24    under the substantive New Jersey law.

25              On the issue of cost and difficulties related to the

1    redactions, I certainly submit there will be more effort on my

2    part to do some redactions, but we disagree that it's going to

3    increase the cost of discovery overall.  If the plaintiff --

4            THE COURT:  Oh, it could.  If you over-redact, we're

5    in here every other week.

6            MR. MATTHEWS:  It could.  The other path is that

7    plaintiff goes into an irrelevant fishing expedition, into all

8    these other areas of our business that don't have anything to

9    do with this case.

10            Those spreadsheets also contain --

11            THE COURT:  I don't think plaintiff wants the

12    irrelevant information.  I think you guys differ on whether the

13    variable-rate information is relevant or not.  I think they

14    would argue we only want -- if you've got something that's got

15    something to do with other than the variable rate in there,

16    they don't want -- they're not looking for that.  They're

17    looking for the information relating to the variable rate.

18            So I think, you know -- I think the thing is that you

19    are defining irrelevant differently.  You're defining, you

20    know, relevant as only fixed rate.  They're defining relevant

21    as fixed and variable-rate information.  I think that's really

22    where we have a fundamental difference.

23            MR. MATTHEWS:  Well, I think --

24            THE COURT:  And I think that's where I'm going to

25    have to weigh in on that in order for you to be able to proceed

1    on what, if anything, can be redacted.

2              MR. MATTHEWS:  Okay.  And again, I just want to be

3    very clear.  To the extent that we have redacted something that

4    related to the sausage, the fixed rate itself, we'll fix that.

5    I don't know that we did.  I take counsel at his word.

6              All we were trying to raise the privilege about is

7    the profitability, the pricing strategies and the cost of the

8    fixed rates themselves, because we believe that if we go down

9    that path, it's going to expand the scope of this case

10   dramatically, expand the scope of discovery dramatically into

11   areas that aren't relevant to the plaintiff as pled.

12             One other quick point on the spreadsheets.  They're

13   massive documents, but they also contain information about

14   electricity in some instances, which certainly is not in issue

15   in this case.  And we haven't touched on that, but I think

16   we're certainly entitled to redact that information.  I mean,

17   this is solely a natural-gas case, and there has been no

18   allegation about any --

19             THE COURT:  Mr. Blank, you don't have any issues

20   about that.

21             MR. BLANKINSHIP:  Your Honor, we don't have any

22   immediate need for information about electricity.  I don't want

23   to hamstring myself before we've even gotten into discovery.

24             THE COURT:  Yes.  My feeling is -- because I know

25   that was raised in the letter, and I feel like it's not an

1    issue right now because you don't believe it's relevant, you're

2    not going to produce it, and then you guys will have to meet

3    and confer.  You'll have to say why you're not producing it and

4    then you'll have to meet and confer and then come to me.  It

5    feels like it's there, but I can't necessarily rule on it

6    because I don't really understand it.  I don't think it's

7    relevant, and I'm inclined to rule that it wouldn't go out, but

8    since I don't -- the parties haven't met and conferred on that

9    issue, I don't want to rule on that.

10             MR. MATTHEWS:  Fair enough.  And I just wanted to

11   raise it because there is -- in some of the spreadsheets, there

12   is information that relates to electricity, and we have

13   redacted and would continue to redact that.

14             THE COURT:  I understand that.  And you just have to

15   explain to Mr. Blankinship you're redacting the stuff on

16   electricity because it's not relevant, and then he can tell you

17   whether he thinks that's appropriate or not depending on what

18   the document looks like.  It's hard in a vacuum for him to say

19   that's fine.  As far as he's standing here, you know, he's

20   going to protect his client well, and he's not going to commit

21   that it's always going to be fine because he doesn't know what

22   the document is going to look like.

23             MR. MATTHEWS:  Right.

24             THE COURT:  Not to speak for you, Mr. Blankinship,

25   but I think I'm accurate there.

 1            MR. BLANKINSHIP:  I think you stated it very well,

 2    your Honor, and I appreciate that.

 3            THE COURT:  Okay.  Okay.  I think I'm prepared to

 4    rule on this.  And hopefully this addresses the issues so we

 5    can move on.  I suspect there will be other issues as discovery

 6    goes on even after I've ruled.

 7            There are two related issues before the Court today

 8    which can be resolved under a single analysis.

 9            First, defendant seeks to move for a protective order

10    under Federal Rules of Civil Procedure 26(c), hereinafter

11    26(c), protecting the disclosure of information regarding trade

12    secrets.  Docket number 38.

13            The trade secrets at issue concern defendant's

14    fixed-rate natural gas contracts.  In response, plaintiff seeks

15    to compel defendant's Rule (30)(b)(6) witness to answer

16    questions regarding the relationship between defendant's fixed

17    and variable rates.  Docket number 40 filed under seal; see

18    also Docket number 48.

19            Second, plaintiff seeks to move to compel the

20    production of documents that have been redacted for information

21    regarding defendant's fixed rates.  Docket number 41.

22    Defendant opposes this request.  Docket number 50.

23            There's currently a stipulated protective order in

24    place, which is Docket number 33.

25            Plaintiff's claim is brought under New Jersey law.

1    The parties do not dispute that the information at issue

2    constitutes trade secret and, under New Jersey law, the "owner

3    of a trade secret has a privilege."  New Jersey statute

4    annotated Section 2A:84A-26; see also New Jersey Rules of

5    Evidence 514.  In a diversity case such as this, Federal Rule

6    of Evidence 501 "requires the application of the state law of

7    privileges, except where the proof is directed to an issue that

8    is governed by federal law."  Lego v. Stratos Lightwave,

9    Incorporated, 224 F.R.D. 576 at 578, Southern District of New

10   York 2004.  Therefore, the Court applies New Jersey law to the

11   extent that the issues concern a trade-secret privilege, but

12   federal law to the discovery request made under the Federal

13   Rules of Civil Procedure.  See Hanna v. Plumer, 380 U.S. 460 at

14   470, 1965.

15        Courts in New Jersey have recognized that "the

16   trade-secret privilege is qualified in the sense that

17   disclosure will be compelled when the information is needed to

18   try some issues in the proceeding.  This is a balancing test.

19   When the need is not strong, disclosure will not be compelled.

20   Where disclosure is required, it must be balanced by a

21   protective order to prevent loss of the property interest."

22   Capital Health Systems, Incorporated v.  Horizon Healthcare

23   Services, Incorporated, 140 A.3d 598, 611, New Jersey Superior

24   Court, Appellate Division, 2016, appeal granted, 158 A.3d 1184,

25   2017.

1          Likewise, under Rule 26(c), the Court must weigh the

2    relevance of the information sought against a showing of good

3    cause for the issuance of a protective order.  See John Wiley &

4    Sons, Incorporated v. Book Dog Books, LLC, 298 F.R.D. 184 at

5    186, Southern District of New York, 2014.  "Relevance, for

6    purposes of discovery, is an extremely broad concept" and "good

7    cause exists when a party shows that disclosure will result in

8    a clearly defined specific and serious injury."  And that's

9    John Wiley & Sons.  Same cite as before.

10          In terms of trade secrets, the Court may "require

11   that a trade secret not be revealed or be revealed only in a

12   specified way."  Federal Rules of Civil Procedure 26(c)(1)(G).

13          Defendant urges the Court to apply the balancing test

14   as described in Capital Health Systems, 140 A.3d at 1611, to

15   resolve both issues.  Docket numbers 38 and 50.  Applying the

16   balancing tests described above, the Court must compare

17   plaintiff's need for the information with the potential harm

18   disclosing such information may cause defendant.

19          First, based on the arguments I heard today and on

20   plaintiff's letters, I find that information regarding fixed

21   rates may be relevant to plaintiff's claim.  See Capital Health

22   Systems 140 A.3d at 609, noting that "in the context of

23   pretrial discovery proceedings in a civil case, the concept of

24   relevance is broader than under the New Jersey Rules of

25   Evidence.  The test is whether the information is useful."

1          Plaintiff believes that defendant "considers the

2    costs and profits it incurs for its fixed-rate customers when

3    it sets variable rates" and that "defendant's fixed rates are

4    almost invariably lower than variable rates because it uses low

5    fixed rates to lure new customers and it can do so knowing that

6    when customers shift to the variable rate, defendant will

7    profiteer at their expense."  Docket number 40, filed under

8    seal; see also Docket number 48.  Plaintiff is entitled to

9    explore this theory of the the case, and the need for this

10   information is strong.

11         Second, I find that defendant would not suffer

12   serious injury from disclosing this material to the plaintiff

13   subject to the stipulated protective order that is already in

14   place.  Defendant has not argued that disclosing the

15   information to plaintiff would be directly harmful.  In fact,

16   defendant admits that plaintiff "is not a competitor."  Docket

17   number 38.  Defendant argues, instead, that "numerous similar

18   class actions have been filed against defendant's competitors,"

19   including by plaintiff's counsel in this case, and that

20   documents filed in this case are "almost certainly monitored by

21   defendant's competitors."  Docket number 38.  Defendant further

22   argues that the "potential inadvertent disclosure of

23   defendant's protected documents might negatively affect

24   defendant's ability to compete with other energy services

25   companies."  Docket number 38.

1          Given that plaintiff is not a direct competitor and

2    that there is a stipulated protective order already in effect,

3    I find that defendant's arguments regarding theoretical harm

4    are unpersuasive.  See Allen v. City of New York, 420 F. Supp.

5    2d, 295 at 302, Southern District of New York, 2006, which

6    says, "Case law is clear that broad allegations of harm,

7    unsubstantiated by specific examples or articulated reasoning,

8    do not satisfy the Rule 26(c) test."  Furthermore, the existing

9    protective order is sufficient to protect the trade secrets.

10   John Wiley & Sons, 298 F.R.D. at 187 to 188; see also

11   Fischer v. Cirrus Design Corporation, No.

12   CIV-A-503-CV-0782(HGM)(DEP), 2005 WL 3159658 at *7, Northern

13   District of New York, November 23rd, 2005.

14          Defendant's request to move for a protective order

15   under Federal Rules of Civil Procedure 26(c) is, therefore,

16   denied, Docket number 38, and plaintiff's request to compel

17   defendant's (30)(b)(6) witness to answer the questions about

18   the relationship between defendant's fixed and variable rates

19   is granted, Docket number 40, filed under seal; see also Docket

20   number 48.  Defendants are, of course, entitled to designate

21   portions of the deposition transcript confidential pursuant to

22   the existing protective order, and the parties are under Court

23   order to treat such information as confidential.  Docket number

24   33.

25          In addition, plaintiff's request to move to compel

1    defendant to produce documents that are only redacted for

2    attorney/client or work-product privilege is denied.  Docket

3    number 41.  However, defendant is directed not to redact

4    information regarding fixed rates from responsive documents.

5    Such documents should be produced subject to the stipulated

6    protective order.  Docket number 33.  See In re Penthouse

7    Executive Club Comp. Litigation, No. 10 CV 1145 KMW, 2012 WL

8    1511772 at *1, Southern District of New York, April 30th, 2012.

9    If subsequent disputes arise regarding the redaction of trade

10   secrets unrelated to variable or fixed rates for natural gas

11   contracts, the parties are directed to meaningfully meet and

12   confer before bringing those issues to the Court.

13              This is the opinion of the Court.

14              Thank you very much, Counsel.

15              MR. BLANKINSHIP:  Thank you, your Honor.

16              MR. MATTHEWS:  Thank you, your Honor.

17              THE COURT:  What I would like to do before we leave

18   is set another conference.  And that will be just a regular

19   status conference to see how everything is going.  We have all

20   fact discovery not to be completed until February 12th of 2018.

21   I don't think we need to get together again until the fall,

22   sometime in October.  Would everybody agree with that?

23              MR. BLANKINSHIP:  Yes, your Honor.  That seems

24   reasonable.

25              MR. MATTHEWS:  Yes, your Honor.

1          THE COURT:  Okay.  So let's look at something the

2    week of October 16, something later in that week, like the 19th

3    or 20th, Ms. Hummel.

4          THE DEPUTY CLERK:  We can do the 19th at 10 a.m.

5          THE COURT:  The 19th at 10 a.m.

6          And let's do that in person.  I want to do the next

7    conference in person.  After that, we can consider going by

8    phone.  Okay?

9          MR. BLANKINSHIP:  Yes, your Honor.

10          THE COURT:  Does that work for everybody?

11          MR. MATTHEWS:  Yes, your Honor.

12          THE COURT:  That conference?

13          MR. MATTHEWS:  May I ask a question --

14          THE COURT:  Yes.

15          MR. MATTHEWS:  -- related to the Court's ruling on

16    the deposition?

17          Is the Court's order that the witness must answer

18    just the question that he's instructed not to answer or that

19    the deposition -- I guess I'm just seeking a little

20    clarification on --

21          THE COURT:  The witness is going to be allowed to

22    answer the question that he was instructed not to answer.  If

23    there are reasonable follow-up questions to that, then those

24    questions can also be asked because that stopped a line of

25    questioning.  However, I don't see this as opening up

1    another -- you know, this isn't a second bite at the apple.

2    This is to ask the questions that he was instructed not to

3    answer and any reasonable follow-up questions.

4              Does that answer?

5              MR. MATTHEWS:  Thank you, your Honor.  That answers

6    it.

7              MR. BLANKINSHIP:  Well, perhaps I could also seek a

8    smidge of a clarification on that, your Honor.

9              The question that the witness was instructed not to

10   answer was about the relationship between the variable rate and

11   the fixed-rate profit margins.  I had some other questions

12   relating -- about how fixed rates and variable rates interact,

13   but I thought it was pretty clear that he was not going to

14   allow any of those.

15             THE COURT:  No.

16             How long has this deposition gone on for?

17             MR. BLANKINSHIP:  I think it only lasted for five

18   hours or so, so we still have a couple hours in the seven.

19             THE COURT:  Yes.  You're not going over -- whatever

20   you have left, you're not going over that.  We're not sitting

21   there and the witness is not sitting there for another day, you

22   know, a full day of seven hours.  It's whatever's remaining in

23   it.  And it really should stick narrowly to what would be on

24   this line of questioning.

25             MR. BLANKINSHIP:  Understood, your Honor.  I

1    appreciate the clarification.  We see no reason to go over

2    seven hours.

3            THE COURT:  So, Mr. Lucks, it's going to be a little

4    bit more broad than you want it to be, because you want him to

5    just answer that question and move on, but the problem is that

6    when you object and a witness -- you know, it's not atypical

7    for a lawyer to just not sit there and ask the next ten

8    questions they might have asked if they had gone down that

9    line.  So Mr. Blankinship's going to be allowed to pursue it.

10   If you think he's crossing over and abusing the privilege the

11   Court has given him, call me --

12           MR. MATTHEWS:  Thank you, your Honor.

13           THE COURT:  -- while the deposition is going on.

14   Okay?

15           MR. MATTHEWS:  Yes, your Honor.  I appreciate that.

16           THE COURT:  And, Mr. Blankinship, I trust you will

17   not abuse the privilege the Court has given you.

18           MR. BLANKINSHIP:  I will not, your Honor.  We will

19   adhere closely to the topic.

20           THE COURT:  Thank you.  Have a good day.

21           MR. BLANKINSHIP:  You, too.

22           MR. MATTHEWS:  Thank you, your Honor.

23

24                         - - - -

25